1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON
9               AT TACOMA

10
    BENJAMIN WALDREN,
11                                          CASE NO.    C06-5707RJB-KLS
                    Plaintiff,
12                                          REPORT AND
        v.                                  RECOMMENDATION
13
    MICHAEL J. ASTRUE, Commissioner of      Noted for November 23, 2007
14   Social Security,

15                  Defendant.

16

17

18          Plaintiff, Benjamin Waldren, has brought this matter for judicial review of the denial of his

19   application for supplemental security income ("SSI") benefits.  This matter has been referred to the

20   undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR

21   4(a)(4) and as authorized by <u>Mathews, Secretary of H.E.W. v. Weber</u>, 423 U.S. 261 (1976).  After

22   reviewing the parties' briefs and the remaining record, the undersigned submits the following Report and

23   Recommendation for the Honorable Robert J. Bryan's review.

24                    <u>FACTUAL AND PROCEDURAL HISTORY</u>

25          Plaintiff currently is 30 years old.[1]  Tr. 29.  He has a general equivalency diploma and no relevant

26   past work experience. Tr. 21.

27

28          [1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to
    Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

On March 26, 2002, plaintiff filed an application for SSI benefits, which was denied at the initial level of review. Tr. 29, 32, 70-73.  Plaintiff filed a second application for SSI benefits on September 30, 2002, alleging disability as of September 1, 1995, due to mental disorders, including depression and a severe panic disorder. Tr. 21, 74-80, 108.  This application was denied both at the initial level and on reconsideration. Tr. 30-31, 36, 42.

A hearing was held before an administrative law judge ("ALJ") on April 8, 2005, at which plaintiff, represented by counsel, appeared and testified, as did a medical expert and a vocational expert. Tr. 604-646.  On July 29, 2005, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically in relevant part:

(1)    at step one of the sequential disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability;

(2)    at step two, plaintiff had "severe" impairments consisting of opiate addiction in remission on methadone, a panic disorder, generalized anxiety, and dysthymia;

(3)    at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings");

(4)    at step four, plaintiff had the residual functional capacity to perform at all levels of exertion, with certain additional non–exertional limitations, and had no past relevant work; and

(5)    at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 26-28.  Plaintiff's request for review was denied by the Appeals Council on November 30, 2006, making the ALJ's decision the Commissioner's final decision. Tr. 6; 20 C.F.R. § 416.1481.

On December 14, 2006, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1-#3).  Specifically, plaintiff argues that decision should be reversed and remanded for an award of benefits or, in the alternative, for further administrative proceedings, for the following reasons:

(a)    the ALJ erred in evaluating the medical evidence in the record;

(b)    the ALJ erred in finding none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; and

(c)    the ALJ erred in finding plaintiff capable of performing other work existing in significant numbers in the national economy.

---

[2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

The undersigned agrees that the ALJ erred in determining plaintiff to be not disabled, and, for the reasons set forth below, recommends that the ALJ's decision be reversed, and that this matter be remanded to the Commissioner for an award of benefits.

<u>DISCUSSION</u>

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision.  <u>Hoffman v. Heckler</u>, 785 F.2d 1423, 1425 (9th Cir. 1986).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Fife v. Heckler</u>, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than a scintilla but less than a preponderance.  <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); <u>Carr v. Sullivan</u>, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision.  <u>Allen v. Heckler</u>, 749 F.2d 577, 579 (9th Cir. 1984).

I.      <u>The ALJ Erred in Evaluating the Medical Evidence in the Record</u>

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. <u>Sample v. Schweiker</u>, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion must be upheld." <u>Morgan v. Commissioner of the Social Security Administration</u>, 169 F.3d 595, 601 (9th Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." <u>Id.</u> at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." <u>Reddick</u>, 157 F.3d at 725.  The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." <u>Id.</u>  The ALJ also may draw inferences "logically flowing from the evidence." <u>Sample</u>, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." <u>Magallanes v. Bowen</u>, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1996). Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." <u>Id.</u> at 830-31. However, the ALJ "need not discuss *all* evidence presented" to him or her. <u>Vincent on Behalf of Vincent v. Heckler</u>, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original). The ALJ must only explain why "significant probative evidence has been rejected." <u>Id.</u>; <u>see also</u> <u>Cotter v. Harris</u>, 642 F.2d 700, 706-07 (3d Cir. 1981); <u>Garfield v. Schweiker</u>, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. <u>Lester</u>, 81 F.3d at 830. On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." <u>Batson v. Commissioner of Social Security Administration</u>, 359 F.3d 1190, 1195 (9th Cir.,2004); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830-31. A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." <u>Id.</u> at 830-31; <u>Tonapetyan</u>, 242 F.3d at 1149.

A.   <u>Dr. Slater</u>

Dr. Charles Slater testified as a medical expert at plaintiff's hearing. Specifically, he testified that in terms of the Part B criteria for the Listings,[3] he found plaintiff's restrictions in activities of daily living to be "moderate or less," his difficulties in maintaining social functioning to be "marked," and his difficulties in maintaining concentration, persistence or pace to be "marked" on average. Tr. 630. In addition, while Dr. Slater testified that there were no repeated episodes of decompensation, he thought that with respect to the Part C Listings criteria, plaintiff had "a long history of psychologic dysfunction, and

---

[3]With respect to each mental disorder contained in the Listings, 20 C.F.R. Part 404, Subpart P, Appendix 1, §12.00A states as follows: "Each listing, except 12.05 and 12.09, consists of a statement describing the disorder(s) addressed by the listing, paragraph A criteria (a set of medical findings), and paragraph B criteria (a set of impairment-related functional limitations). There are additional functional criteria (paragraph C criteria) in 12.02, 12.03, 12.04, and 12.06 . . . We will assess the paragraph B criteria before we apply the paragraph C criteria. We will assess the paragraph C criteria only if we find that the paragraph B criteria are not satisfied. We will find that you have a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied."

1   debilitation," even though there had been no hospitalizations. Id.  Dr. Slater, furthermore, did not feel that

2   drugs or alcohol were "material to his condition." Id.

3       In particular, Dr. Slater testified that although the drugs had not helped plaintiff "in any sense, he

4   did think there was "a clear process underneath the drugs." Tr. 631.  Dr. Slater testified that "some" of his

5   conclusions were based on plaintiff's own testimony, even though there was "plenty of evidence" in the

6   record that plaintiff was "not necessarily the most reliable historian." Tr. 631-32.  For example, Dr. Slater

7   testified that his "clinical judgments or assumptions" were based to some extent on plaintiff's report that

8   what had been going on with him began as far back as "his junior high years or early high school," despite

9   the absence of any records from that period. Tr. 632.  However, Dr. Slater also testified that he based his

10  testimony on other medical opinion source evidence in the record as well. Id.

11      In terms of "presentation over the last year," Dr. Slater testified that "[c]linically" he did not think

12  it would have been significantly different than what it had been if plaintiff "had been completely clean of

13  street drugs and unauthorized substances." Tr. 634.  Dr. Slater agreed, however, that it would be "difficult,

14  if not impossible, to ferret out what was due to drug use and what was due to psychological impairments"

15  before plaintiff began taking methadone in October 2002. Tr. 22, 634-35.  Nevertheless, he also agreed

16  that "given the period of time" plaintiff had been taking methadone, which, although not "perfect,"

17  included "substantial periods" where he tested as being "clean," the evaluations provided by Terilee

18  Wingate, Ph.D., Daniel Neims, Ph.D., and plaintiff's mental health treatment providers were all

19  "consistent with his clinical presentation" independent of "the effects of illicit drugs," and thus

20  "appropriate." Tr. 635.

21      Dr. Slater went on to testify that in effect plaintiff "could not function outside of a highly structured

22  environment," and that "even a minimal increase in mental demands or change in the environment" would

23  be predicted to cause him to decompensate. Tr. 636-37; see also, e.g., Tr. 156.  This is because, Dr. Slater

24  testified, plaintiff structured his environment "quite highly" in that he did not leave his apartment unless he

25  "absolutely" had to for treatment, did not have any friends over, did not "have a life," and structured "his

26  own life in a way" that was "going to help him function the best" he could.  Tr. 637.  He further testified

27  that plaintiff's life overall was "one long decompensation," which began in "junior high/early high

28  school," noting that he had dropped out of school and stayed at home. Tr. 638-39.  Finally, Dr. Slater

testified that he did not disagree with the testimony of Marne Nelson, A.R.N.P., who treated plaintiff and who opined in late March 2005, that he could not maintain employment "because of the severity, chronicity and treatment resistance of his anxiety." Tr. 568, 639-40.

The ALJ addressed Dr. Slater's testimony as follows:

> Dr. Slater testified that the claimant had impairments, which meet Medical Listings 12.04 [affective disorders], 12.06 [anxiety related disorders], 12.08 [personality disorders], and 12.09 [substance addiction disorders].  The doctor's testimony is considered expert opinion, which must be given appropriate weight (Social Security Ruling 96-6p).  The undersigned affords Dr. Slater's opinion no weight because it is not supported by the other substantial evidence of record and was essentially based on the claimant's presentation at the hearing of being highly agitated.  The claimant had a long history of opiate abuse[.] (Exhibit 15F/98)  He entered methadone treatment in October 2002 after failing several other programs.  In December 2002 he was diagnosed with depression, NOS and dependent personality disorder with a [global assessment of functioning] GAF of 60, which is to say that he had moderate symptoms or moderate difficulty in social, occupational, or school functioning.  At that time there was no evidence of anxiety. (Exhibit 4F)  He was evaluated again a month later and diagnosed with panic disorder with agoraphobia, social phobia, obsessive compulsive traits, generalized anxiety, dysthymia, major depressive disorder, alcohol/cannabis abuse, nicotine dependence, rule out Tourette's and avoidant personality disorder.  His GAF was assessed at 48 but on examination there was no psychomotor agitation/retardation or tearfulness, and he did not appear as overly distressed or anxious.  His speech was rapid a [sic] minimally pressured, but with normal volume and rhythm and his thought processes were logical and coherent without loose associations.  His attention and concentration were good (Exhibit 6F/7-9) and he refused to participate in group therapy or receive any psychiatric counseling other than treatment at the methadone clinic.  As discussed above, counseling notes from the methadone clinic clearly indicate that he was fairly active during this period.  Inconsistent with Dr. Slater's opinion, the claimant did not have the mental limitations contemplated in Part B of the listings.

Tr. 23-24. Plaintiff argues the above reasons for rejecting Dr. Slater's testimony were improper because that testimony is supported by the substantial evidence contained in the record, and Dr. Slater did not base his testimony on the hearing presentation.  For the reasons set forth below, the undersigned agrees the ALJ erred in evaluating Dr. Slater's testimony.

First, it is clear that Dr. Slater did not base his testimony on plaintiff's "presentation at the hearing of being highly agitated." Id.  Nowhere in his testimony did Dr. Slater state or otherwise indicate that he was taking plaintiff's hearing presentation into account, or that he noticed plaintiff was highly agitated at the time.  While the ALJ did ask Dr. Slater how much of his testimony was based on the testimony plaintiff provided, this is by no means the same as asking about plaintiff's presentation during the hearing. Tr. 630-31.  Accordingly, the undersigned finds that Dr. Slater did not base his testimony on plaintiff's presentation at the hearing.  Indeed, the hearing transcript fails to reveal plaintiff at the time in fact

1  exhibited or engaged in behavior indicative of high agitation as found by the ALJ.

2        Second, the undersigned further finds the ALJ provided an insufficient basis for asserting that the

3  "other substantial evidence" in the record did not support Dr. Slater's opinion that plaintiff's impairments

4  met the criteria for Listings 12.04, 12.06, 12.08, and 12.09.  Plaintiff argues that opinion is supported by

5  substantial evidence from his treating psychiatrist, Sara J. Lerner, M.D., three examining psychologists,

6  William H. Coleman, Ph.D., Dr. Wingate and Dr. Neims, and his treating nurse practitioner, Ms. Nelson.

7  Defendant counters that because Dr. Slater testified that he relied on the findings of Dr. Lerner in making

8  his findings (Tr. 632), and because Dr. Lerner's opinion is not supported by clinical evidence, Dr. Slater's

9  opinion also lacks such support, and therefore the ALJ properly gave it no weight.  As explained below,

10 however, neither party has quite got it right.

11       As noted above, immediately following his statement that he was giving no weight to Dr. Slater's

12 step three opinion, in addition to noting plaintiff's long history of drug abuse and subsequent methadone

13 treatment, the ALJ discussed two psychiatric evaluations performed by Christine Suydam, M.D., in mid-

14 December 2002, and by Dr. Lerner in late January 2003, respectively, although he did not mention these

15 two psychologists by name. See id. (citing Exhibits 4F (Tr. 170-74) and 6F/7-9 (Tr. 195-97)).  With regard

16 to the latter opinion, i.e., that of Dr. Lerner, the ALJ further stated she had assessed plaintiff with a lower

17 GAF score of 48 in contrast with the higher GAF score of 60 assessed by Dr. Suydam. Id.  The ALJ then

18 discussed clinical findings Dr. Lerner had made that seemingly were not entirely consistent with that lower

19 score. Id.  Finally, the ALJ mentioned mental health clinic treatment notes that he stated indicated plaintiff

20 was fairly active "during this period." Id.

21       Although it certainly is within the ALJ's discretion to disregard the conflicting opinion provided by

22 one examining physician's diagnosis where the opinion of the examining physician adopted by the ALJ is

23 based on independent clinical findings, the ALJ in this case did not expressly state why he found the GAF

24 assessment made by Dr. Suydam to be more valid, or even that he in fact was adopting her assessment

25 over that made by Dr. Lerner. See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  It is true, as noted

26 above, that the ALJ appeared to treat the clinical findings made by Dr. Lerner as being inconsistent with

27 the low GAF score with which she assessed plaintiff.  However, the ALJ did not at all discuss additional

28 remarks contained in her report that it sounded to her as though plaintiff had been "experiencing a

disabling level of anxiety and depression for the last ten years." Tr. 198.

1    At least in a longitudinal sense, therefore, this latter statement does seem to be more consistent

2    with a GAF score of 48, despite the one-time mental status examination findings.  The ALJ did not explain

3    this discrepancy or adequately resolve it.  The ALJ also failed to adequately explain how plaintiff's drug

4    abuse history and methadone treatment lessened the credibility of the testimony given by Dr. Slater,

5    particularly in light of the fact that Dr. Slater appears to have been well aware of that history.  Similarly,

6    the ALJ did not discuss in any detail how the activity he found plaintiff's mental health clinic treatment

7    notes showed  reflected adversely on that testimony, or why that evidence should be given more weight

8    than the opinion of a testifying medical expert.  To that extent the ALJ erred.

9    With respect to defendant's argument, as discussed above, the ALJ did not expressly state he was

10    rejecting all of Dr. Lerner's findings or her entire evaluation, though again he did seem to call into

11    question the validity of the GAF score she assessed.  Regardless, also as noted above, Dr. Slater

12    specifically testified that he based his testimony on other medical evidence in the record in addition to the

13    evaluation provided by Dr. Lerner, including those of Drs. Wingate and Neims and the opinion of Ms.

14    Nelson.  That being said, as explained below, the undersigned does not find the other medical evidence in

15    the record necessarily supports the testimony of Dr. Slater that plaintiff's impairments meet the criteria of

16    Listings 12.04, 12.06, 12.08, or 12.09, as argued by plaintiff.

17    It is true that Dr. Lerner stated in her late January 2003 evaluation that it sounded as if plaintiff had

18    "been experiencing a disabling level of anxiety and depression for the last ten years." Tr. 198.  This though

19    is not at all the same as making a specific determination that one ore more of plaintiff's impairments met

20    or equaled the criteria therefor contained in the Listings as found by Dr. Slater.  Similarly, while Dr.

21    Coleman found that plaintiff had a moderate (i.e., "[s]ignificant interference with basic work related

22    activities") to marked (i.e., "[v]ery significant interference with basic work related activities") degree of

23    limitation in several mental functional areas (Tr. 165; see also Tr. 276), again this does not constitute a

24    specific finding of Listing level severity.  Indeed, Dr. Coleman further opined that plaintiff "[s]hould be

25    employable if [his] mood disorder is successfully treated." Tr. 166.

26    Dr. Wingate also found plaintiff had a moderate to marked degree of limitation in many areas of

27    mental functioning, but some of these limitations were subject to plaintiff's "report" being "accurate," and

28    she specifically noted his "strong disability conviction." Tr. 278-79.  Again, however, even assuming that

1   these findings accurately describe plaintiff's condition, Dr. Wingate made no specific finding of disability

2   under the Listings, and it is not at all clear that the mental functional limitations with which she did assess

3   plaintiff rise to that level in all of the areas addressed by Dr. Slater.  The same is true with respect to the

4   findings made by Dr. Neims in early October 2004 (Tr. 493, 498), and once more in early October 2005

5   (Tr. 576).  With respect to the latter opinion, although the "severe" (i.e., "[i]nability to perform one or

6   more basic work-related activities") degree of limitation with which Dr. Neims assessed plaintiff (Tr. 572,

7   576) might be indicative of a significantly restricted residual functional capacity, such functional

8   limitations come into play only at steps four and five of the sequential disability evaluation process, and

9   thus are not considered in making a step three determination under the Listings.

10          Lastly, in terms of Ms. Nelson's late March 2005 opinion that plaintiff "was chronically disabled,"

11   and that he would "not be able to maintain employment" due to his "mental health problems" –

12   specifically "the severity, chronicity and treatment resistance of his anxiety" – this too does not necessarily

13   support Dr. Slater's findings of Listing level severity again for the same reasons stated above. Tr. 568.  In

14   addition, Ms. Nelson is not an "acceptable medical source," and thus her opinion may be given less

15   weight, an issue which shall be dealt with in greater detail below.  See Gomez v. Chater, 74 F.3d 967, 970-

16   71 (9th Cir. 1996) ("acceptable medical sources" include licensed physicians and licensed or certified

17   psychologists, and not nurse practitioners); see also 20 C.F.R. § 416.913(a), (d).

18          Plaintiff fails to mention, furthermore, other medical opinion source evidence in the record which

19   appears to contradict Dr. Slater's testimony that he met Listing level severity and thus was disabled on that

20   basis.  For example, in early May 2002, Janet Lewis, Ph.D., a non-examining psychologist, assessed

21   plaintiff with mostly mild to moderate mental functional limitations specifically in the context of Listing

22   12.04, 12.06 and 12.08, noting that he was markedly limited only in his ability to interact appropriately

23   with the general public. Tr. 155, 159-61.  She further noted that the medical evidence in the record did not

24   establish the presence of Listing paragraph "'C' Criteria," and that plaintiff appeared to be "capable of

25   work," but needed "to get in to treatment." Tr. 156, 161.

26          Also as discussed above, plaintiff underwent a psychiatric evaluation conducted by Dr. Suydam in

27   mid-December 2002, during which she noted he "laughed and joked" at times, "complimented" her on her

28   wardrobe, and "seemed at ease with no apparent discomfort with the interview." Tr. 171.  His mental

status examination revealed normal speech and a bright, cheerful and engaged effect, despite his own self-report of being depressed and anxious. Tr. 173.  Thought content and memory also appeared to be intact, and his insight and judgment were found to be "fair." Id.  Dr. Suydam thus diagnosed plaintiff with depression, a dependant personality disorder and a current GAF score of 60. Id.  She concluded that, although he had not done so in the past, if plaintiff were to follow up on recommended mental health treatment, "his ability to return to a higher functioning capacity" could be augmented. Tr. 174.  This indicates Dr. Suydam would not necessarily agree that plaintiff's impairments rose to Listing level severity.

Another non-examining psychologist, Cynthia Collingwood, Ph.D., completed a psychiatric review technique form in early January 2003, in which she found plaintiff at most suffered from mild impairments in his mental functioning, again specifically in the context of Listing 12.04 and 12.08. Tr. 185.  She too did not find that the medical evidence in the record established the presence of the paragraph "'C' Criteria." Tr. 186.  Dr. Collingwood concluded plaintiff's allegation of disability due to his mental impairment was only "partially credible," in that his mental status examination and activities of daily living indicated he retained the "capacity for productive tasks, without evidence of severe disability." Tr. 187.

Finally, although he did not specifically assess plaintiff's mental limitations to determine whether plaintiff's impairments met any of the Listings, Charles Regets, Ph.D., a third non-examining psychologist, found plaintiff suffered from at most moderate mental functional limitations. Tr. 232-33.  Dr. Regets also found him to be capable of performing "simple and some detailed tasks for a period of two hours or more," of interacting "with a few coworkers and supervisors," although not "with the general public in anything other than superficially social roles," and of adapting "to the normal stresses encountered in competitive work environments." Tr. 234.  This too constitutes further medical opinion source evidence that plaintiff's impairments may not have risen to the level of disability found by Dr. Slater.

B.   Dr. Lerner

Plaintiff argues the ALJ improperly rejected the opinions of his treating psychologist, Dr. Lerner, who, as discussed above, evaluated plaintiff in late January 2003.  During the mental status examination, plaintiff made "good eye contact," and even was "once or twice a little flirtatious." Tr. 197.  His speech was "rapid and a little pressured, but with normal volume and rhythm." Id.  There was "no psychomotor

1   agitation or retardation," and while he appeared "mildly uneasy," his affect was appropriate, and he did

2   "not come across as overly distressed or anxious." Id.  Plaintiff's thought processes were "logical and

3   coherent," his attention, concentration and memory were all "good," and his intelligence appeared to be "at

4   least high average." Id.  His judgment and insight also were "reasonable." Id.

5       Dr. Lerner diagnosed plaintiff with a panic disorder with agoraphobia, a generalized social phobia,

6   obsessive-compulsive traits, a generalized anxiety disorder, an early onset dysthymic disorder, recurrent

7   major depression in remission, and an avoidant personality disorder. Tr. 198.  Dr. Lerner also assessed him

8   with a GAF score of 48, both current and the best within the past year. Tr. 198-99.  In addition, Dr. Lerner

9   provided an opinion as to plaintiff's functional assessment, which reads in relevant part:

10          It sounds as though he has been experiencing a disabling level of anxiety and
            depression for the last ten years, but remarkably has not gotten any help and indeed this
11          is this first contact with a mental health practitioner.  He has not even been prescribed
            an antidepressant from a family doctor.  I have to wonder that there must be something
12          else going on besides depression, panic, and agoraphobia to keep the patient from
            getting help, since help is so easily available, and yet he did not seek it or get it for so
13          long, even though his symptoms crippled him to the point that he has never held a job,
            has no friends, and was living in a run down shack, hardly leaving it to get food. . . .
14          [P]erhaps it was his extreme level of anxiety and self-depreciation mixed with
            hopelessness that kept him from getting help.  Or, there may be some sort of schizo-like
15          component that keeps him disconnected from people. . . .

16  Tr. 198.  Dr. Lerner did conclude, however, that mental health counseling to "improve his social skills and

17  get his life back on track, including a work program would be very useful." Tr. 199.

18      Plaintiff asserts the ALJ gave no reason for rejecting Dr. Lerner's "opinion of serious impairment,

19  as reflected in a GAF score of 48," further asserting that the ALJ did not even mention that opinion in his

20  discussion of the evidence in the record, let alone state what weight he was giving to it. Plaintiff's Opening

21  Brief, p. 19.  Plaintiff also argues the GAF score Dr. Lerner assessed was consistent with those provided

22  by his mental health clinic treatment providers, which include scores of 40, 41 and 45 in early November

23  2002 (Tr. 220), early November 2003 (Tr. 320), and early May 2004 (Tr. 298) respectively.  Plaintiff

24  insists the GAF score of 48 assessed by Dr. Lerner is consistent with the evaluations and opinions

25  provided by Drs. Coleman, Wingate and Neims as well.  Defendant, as discussed above, argues that the

26  clinical evidence did not support Dr. Lerner's opinion, and thus that the ALJ properly rejected it on this

27  basis.

28      As pointed out by defendant and as noted above, the ALJ did address Dr. Lerner's evaluation and

GAF assessment in the context of evaluating Dr. Slater's testimony, although he did not note specifically that it was she who provided them. See Tr. 23. As discussed above, furthermore, the ALJ appeared to call into question the GAF score with which she assessed plaintiff, seeming to find the higher GAF score of 60 assessed by Dr. Suydam to be more valid. Also as discussed above, however, the ALJ did not sufficiently explain his reasons for discounting Dr. Lerner's GAF assessment, nor did he address her statement that it sounded as though plaintiff had been "experiencing a disabling level of anxiety and depression for the last ten years" or analyze it in context with the rest of her evaluation. Tr. 198.

Once more though, the undersigned declines to find that the substantial medical evidence in the record necessarily supports the low GAF score assessed by Dr. Lerner as argued by plaintiff. As discussed above, Dr. Suydam, who evaluated plaintiff less than two months before Dr. Lerner did, assessed plaintiff with a GAF score of 60. Tr. 173. Also as discussed above, the ALJ may disregard the conflicting opinion provided by one examining physician, where the opinion of the examining physician adopted by the ALJ is based on independent clinical findings, although the ALJ here did not sufficiently set forth his reasons for doing so. See Saelee, 94 F.3d at 522.

In addition, again as discussed above, several other medical opinion sources in the record, such as Drs. Lewis, Collingwood and Regets, found plaintiff to have mostly mild to moderate mental functional limitations, which appear to be less severe than a GAF score of 48 would indicate. Accordingly, while, as plaintiff argues, those of Drs. Coleman, Wingate and Neims, may be more indicative or consistent with the low GAF score assessed by Dr. Lerner, it is not clear the substantial evidence in the record overall supports such a finding, even taking into account the similarly low GAF scores assessed by plaintiff's mental health clinic treatment providers.

C.    Drs. Wingate, Neims and Coleman

Plaintiff argues the ALJ erred in evaluating the opinions of Drs. Wingate, Neims and Coleman, who he notes all concluded independently that he had a marked limitation in his ability to respond appropriately to and tolerate the pressures and expectations of a normal work setting. Tr. 165, 278, 493, 576. The only statement the ALJ made regarding these opinions, plaintiff further notes, was that while Dr. Coleman and Dr. Neims found him to be "severely limited (Exhibit 3F, 18F)" in early March 2002, and early October 2004, respectively, it was "unknown whether or not they were aware of his medical history

1   of prescription abuse and non-compliance and lack of truthfulness with this doctors." Tr. 25 (citing to

2   Exhibits 3F (Tr. 163-69) and 18F (Tr. 491-505)).  Plaintiff argues that this is an insufficient reason for

3   rejecting their two opinions, and that the ALJ erred in failing to address at all the opinion of Dr. Wingate

4   on this issue, as well as that provided by Dr. Neims in early October 2005.  The undersigned agrees.

5          Defendant argues the ALJ rejected the above opinions because of plaintiff's abuse of prescription

6   drugs, non-compliance with recommended treatment, and lack of candor with his treating physicians.

7   This, however, is not what the ALJ actually found.  Rather, as pointed out by plaintiff and noted above, the

8   ALJ rejected Dr. Coleman's early March 2002 opinion and Dr. Neims' early October 2004 opinion,

9   because it was "unknown" whether they were aware of these issues.  The undersigned thus agrees with

10  plaintiff that if it was not clear to the ALJ whether these medical sources were aware of the existence of

11  such factors, and if those factors would cause the ALJ to reject their opinions, he had a duty to further

12  develop the record to resolve this ambiguity by re-contacting them. See Mayes v. Massanari, 276 F.3d 453,

13  459 (9th Cir. 2001) (ALJ's duty to further develop record triggered when evidence is ambiguous or when

14  record is inadequate to allow for proper evaluation of evidence); see also 20 C.F.R. § 416.927(c)(3).

15         The undersigned further finds that the ALJ provided no reasons for rejecting, and indeed did not

16  appear to even address Dr. Wingate's opinion or Dr. Neims' second early October 2005 opinion.  These

17  medical sources are both examining physicians, and thus the ALJ was required to address them and

18  provide specific and legitimate reasons for rejecting them.  This the ALJ did not do.  Accordingly, the

19  undersigned finds the ALJ erred in this respect as well.

20         D.    Dr. Regets

21         As discussed above, Charles Regets, Ph.D., a non-examining physician, found plaintiff moderately

22  limited in a number of mental functional areas in mid-May 2003, including in his ability to: maintain

23  attention and concentration; complete a normal workday and workweek; perform at a consistent pace;

24  interact appropriately with the general public; accept instructions and respond appropriately to criticism

25  from supervisors; and respond appropriately to changes in the work setting. Tr. 232-33.  Also as discussed

26  above, Dr. Regets found plaintiff to be capable of performing "simple and some detailed tasks for a period

27  of two hours or more," interacting with "a few" co-workers and supervisors, and adapting "to the normal

28  stresses encountered in competitive work environments." Tr. 234.  He further found plaintiff's "[d]eficits

1    in social capability would preclude working with the general public in anything other than superficially

2    social roles." Id.

3            Plaintiff argues the ALJ erred by failing to address Dr. Regets' findings and opinion in his

4    decision.  The undersigned agrees.  Dr. Regets is an "acceptable medical source," as that term is defined in

5    the Social Security Regulations, and thus his opinion is entitled to consideration in establishing whether

6    plaintiff has a medically determinable impairment, and whether that impairment is disabling. See Gomez,

7    74 F.3d at 970-71 (9th Cir. 1996) ("acceptable medical sources" include licensed physicians and licensed

8    or certified psychologists); see also 20 C.F.R. § 416.913(a), (d).  Indeed, a non-examining psychologist's

9    opinion may constitute substantial evidence if "it is consistent with other independent evidence in the

10   record." Lester at 830-31; Tonapetyan, 242 F.3d at 1149.

11           Defendant argues there is no error here, as the ALJ accommodated the mental functional

12   limitations Dr. Regets found by including restrictions in his assessment of plaintiff's residual functional

13   capacity that were consistent therewith.  The undersigned disagrees.  In terms of mental functional

14   restrictions, the ALJ assessed plaintiff with the following residual functional capacity:

15           He is limited to simple repetitive work, which does not require contact with the public
             or more than limited contact with co-workers.  He should not work handling money or
16           have access to medication.  He has the following mental limitations set forth in "Part
             B" of the mental listings: moderate restriction of activities of daily living; marked
17           difficulties in maintaining social functioning; moderate difficulties in maintaining
             concentration, persistence or pace; and no episodes of decompensation.
18
19   Tr. 25.  The ALJ, however, failed to incorporate some of the more specific moderate mental functional

20   limitations found by Dr. Regets, such as completing a normal workday and workweek, accepting

21   instructions and responding appropriately to criticism from supervisors, and responding appropriately to

22   changes in the work setting.

23           Defendant asserts the limitation regarding completing a normal workday and workweek, and, by

24   implication, the other more specific moderate limitations noted above, are not appropriate for inclusion in

25   plaintiff's residual functional capacity assessment, because it is one of four categories evaluated at step

26   three of the sequential disability evaluation process.  It appears defendant is making this assertion based on

27   the assumption that these limitations were included on a psychiatric review technique form also completed

28   by Dr. Regets at the time, which does appear to focus on the step three determination.  This is not the case,

     however, as each such limitation Dr. Regets found instead was checked off on a mental residual functional

1  capacity assessment form, which is not concerned with the step three analysis.

2          E.   Ms. Nelson

3          In late March 2005, Marne Nelson, A.R.N.P., wrote a letter to plaintiff's attorney, in which she

4  opined that plaintiff had a primary diagnosis of panic disorder with agoraphobia, along with the following

5  additional diagnoses: social phobia; a generalized anxiety disorder; a dysthymic disorder; a recurrent

6  major depressive disorder; opiate dependence on methadone; and an avoidant personality disorder. Tr.

7  568.  In addition, Ms. Nelson further opined that plaintiff's "primary problems" were "with anxiety and

8  panic," and, as discussed above, that "because of the severity, chronicity and treatment resistance of his

9  anxiety," he would not be able to "manage stress, especially interpersonal stress" or "maintain

10  employment," and that he was "chronically disabled by his mental health problems." Id.

11          Plaintiff argues the ALJ did not properly evaluate Ms. Nelson's opinion.  As plaintiff points out,

12  the only reference the ALJ made to Ms. Nelson's opinion in his decision was to note that even though she

13  was "not an acceptable medical source . . . it must be noted that she too was highly suspicious of the

14  claimant's intentions for treatment and drug seeking behavior." Tr. 24.  Defendant argues that the ALJ

15  considered Ms. Nelson's statements, that he discussed the weight given to them, and that because she is

16  not an acceptable medical source, only needed to, and did properly, give germane reasons for rejecting

17  them.  Plaintiff asserts that because Ms. Nelson is a "medical witness," though not an acceptable medical

18  source, she should not be treated merely as a non-medical lay witness, and thus her opinion should receive

19  some greater, although unspecified, weight than that which is given to lay witness statements.

20          Both parties again have not gotten it right.  First, plaintiff's assertion that medical sources, such as

21  nurse practitioners, who are not acceptable medical sources, are entitled to some degree of weight greater

22  than that given to lay witnesses, i.e., other sources who are not medical sources, is not supported by legal

23  authority.  Plaintiff does cite to Social Security Ruling ("SSR") 06-03p, which states that:

24          . . . [M]edical sources who are not "acceptable medical sources," such as nurse
           practitioners, physician assistants, and licensed clinical social workers, have
25          increasingly assumed a greater percentage of the treatment and evaluation functions
           previously handled primarily by physicians and psychologists. Opinions from these
26          medical sources, who are not technically deemed "acceptable medical sources" under
           our rules, are important and should be evaluated on key issues such as impairment
27          severity and functional effects, along with the other relevant evidence in the file.

28  2006 WL 2329939 *3.  While this statement does indicate the Commissioner considers such other medical

REPORT AND RECOMMENDATION
Page - 15

1  sources as important and should be evaluated with regard to the above noted issues, it says little

2  concerning the actual weight to be given thereto.

3        Other language contained in SSR 06-03p, however, clearly indicates that medical sources who are

4  not acceptable medical sources are to be treated in the same manner as other sources who are not medical

5  sources.  For example, evidence or information from "other sources," which includes both medical sources

6  who are not acceptable medical sources and non-medical sources, "may be based on special knowledge" of

7  the claimant, and "may provide insight into the severity" of the claimant's impairments and how they

8  affect the claimant's "ability to function." Id. at *2.  In addition, factors used to evaluate opinions from

9  medical sources who are not acceptable medical sources are the same as those used to evaluate opinions

10 from non-medical sources who have seen the claimant "in their professional capacity." Id. at *4-*5.

11 Indeed, although "depending on the particular facts in a case," the "opinion from a medical source who is

12 not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,'" so too

13 may the opinion of a non-medical source, "under certain circumstances, properly be determined to

14 outweigh the opinion from a medical source, including a treating source." Id. at *5-*6.

15       Accordingly, it appears that while the Commissioner recognizes the importance of considering the

16 opinions provided by other medical sources, no special weight is necessarily given to them over those that

17 are provided by other non-medical sources, or at least those who have seen the claimant in a professional

18 capacity.  This, does not mean however, that the ALJ properly evaluated Ms. Nelson's opinion as argued

19 by defendant.  As discussed above, the only reference the ALJ made to Ms. Nelson's opinion was to point

20 out that she too was "highly suspicious" of plaintiff's "intentions for treatment and drug seeking

21 behavior."  Nowhere in his decision though did the ALJ actually appear to have addressed the nature and

22 substance of Ms. Nelson's opinion concerning plaintiff's disability and his ability to maintain employment.

23 This is in contrast to the requirement contained in SSR 06-03p that:

24          [T]he adjudicator generally should explain the weight given to opinions from these
            "other sources," or otherwise ensure that the discussion of the evidence in the
25          determination or decision allows a claimant or subsequent reviewer to follow the
            adjudicator's reasoning, when such opinions may have an effect on the outcome of the
26          case.

27 Id. at *6.  This the ALJ did not do.  As such, and given the content of Ms. Nelson's opinion, her treatment

28 relationship with plaintiff, and the fact that, as pointed out by plaintiff, Dr. Slater did not disagree with her

1    opinion, the ALJ erred.

2    II.    <u>The ALJ's Step Three Analysis</u>

3        At step three of the sequential disability evaluation process, the ALJ must evaluate the claimant's

4    impairments to see if they meet or equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P,

5    Appendix 1. 20 C.F.R. § 416.920(d); <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999).  If any of the

6    claimant's impairments meet or equal a Listing, i.e., listed impairment, he or she is deemed disabled. <u>Id.</u>

7    The burden of proof is on the claimant to establish he or she meets or equals any of the impairments in the

8    Listings. <u>Tacket</u>, 180 F.3d at 1098.

9        A mental or physical impairment "must result from anatomical, physiological, or psychological

10    abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques."

11    20 C.F.R.§ 416.908.  It must be established by medical evidence "consisting of signs, symptoms, and

12    laboratory findings." <u>Id.</u>  An impairment meets a listed impairment "only when it manifests the specific

13    findings described in the set of medical criteria for that listed impairment." SSR 83-19, 1983 WL 31248

14    *2.  An impairment equals a listed impairment "only if the medical findings (defined as a set of symptoms,

15    signs, and laboratory findings) are at least equivalent in severity to the set of medical findings for the listed

16    impairment." <u>Id.</u> at *2.  However, "symptoms alone" will not justify a finding of equivalence. <u>Id.</u>

17        As noted above, the ALJ found that none of plaintiff's impairments met the criteria of any of those

18    contained in the Listings. Tr. 27.  Plaintiff challenges the ALJ's step three finding on the basis that the ALJ

19    erred in rejecting the opinion of Dr. Slater that his mental impairments met the criteria of those contained

20    in Listings 12.04, 12.06, 12.08, and 12.09. Tr. 23.  As discussed above, the ALJ's reasons for rejecting that

21    opinion were insufficient.  As such, the undersigned finds the ALJ erred in finding that none of plaintiff's

22    impairments met the criteria of those contained in the Listings on that basis as well.  Nevertheless, given

23    that, also as discussed above, it is not clear that the substantial evidence in the record supports Dr. Slater's

24    opinion regarding Listing-level severity, the undersigned disagrees that plaintiff necessarily should have

25    been found disabled at step three.

26    III.    <u>The ALJ Erred in Finding Plaintiff Not Disabled at Step Five</u>

27        If a disability determination "cannot be made on the basis of medical factors alone at step three of

28    the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and

1    assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A

2    claimant's residual functional capacity assessment is used at step four to determine whether he or she can

3    do his or her past relevant work, and at step five to determine whether he or she can do other work. Id.  It

4    thus is what the claimant "can still do despite his or her limitations." Id.

5           A claimant's residual functional capacity is the maximum amount of work the claimant is able to

6    perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work

7    must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only

8    those limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a

9    claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-

10   related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the

11   medical or other evidence." Id. at *7.

12          Here, the ALJ assessed plaintiff with the following residual functional capacity:

13          [T]he claimant retains the . . . capacity to perform all levels of exertion.  He is limited
            to simple repetitive work, which does not require contact with the public or more than
14          limited contact with co-workers.  He should not work handling money or have access to
            medication.  He has the following mental limitations set forth in "Part B" of the mental
15          listings: moderate restriction of activities of daily living; marked difficulties in
            maintaining social functioning; moderate difficulties in maintaining concentration,
16          persistence or pace; and no episodes of decompensation.

17   Tr. 25.  Plaintiff does not challenge the ALJ's findings regarding his physical residual functional capacity.

18   Plaintiff also does not expressly challenge the ALJ's assessment of his mental residual functional capacity.

19   Nevertheless, given the errors the ALJ made in evaluating the acceptable and other medical opinion source

20   evidence in the record concerning plaintiff's mental functional limitations discussed above, it is not at all

21   clear that the residual functional capacity with which the ALJ did assess plaintiff accurately describes all

22   of his restrictions in that regard.  To that extent, the ALJ erred here as well.

23          If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation

24   process the ALJ must show there are a significant number of jobs in the national economy the claimant is

25   able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 416.920(d), (e).  The ALJ

26   can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-

27   Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157,

28   1162 (9th Cir. 2000).

1    An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical

2    posed by the ALJ. <u>Martinez v. Heckler</u>, 807 F.2d 771, 774 (9th Cir. 1987); <u>Gallant v. Heckler</u>, 753 F.2d

3    1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the

4    medical evidence to qualify as substantial evidence. <u>Embrey v. Bowen</u>, 849 F.2d 418, 422 (9th Cir. 1988).

5    Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported

6    by the medical record." <u>Embrey</u>, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from

7    that description those limitations he or she finds do not exist. <u>Rollins v. Massanari</u>, 261 F.3d 853, 857 (9th

8    Cir. 2001).

9    At the hearing, the ALJ posed a hypothetical question to the vocational expert that contained

10   mental functional limitations substantially similar to those contained in the ALJ's assessment of plaintiff's

11   mental residual functional capacity.[4] Tr. 640-41.  In response, the vocational expert testified that there

12   were other jobs plaintiff could do given the limitations contained in the hypothetical question. Tr. 641.

13   Based on the vocational expert's testimony, the ALJ found plaintiff to be capable of performing other jobs

14   existing in significant numbers in the national economy. Tr. 26-27.  Once more, although plaintiff has not

15   specifically challenged the ALJ's step five findings in this regard, the undersigned finds that given the

16   ALJ's errors in evaluating the medical opinion source evidence in the record and in assessing plaintiff's

17   residual functional capacity, it is not clear the hypothetical question posed to the vocational expert

18   accurately reflected all of the mental functional restrictions plaintiff had.  Here too then the ALJ erred.

19   Plaintiff further argues, however, that because the vocational expert also testified that an individual

20   who was moderately limited in his or her ability to complete a normal workday and workweek and

21   perform at a consistent pace would preclude that individual's ability to sustain employment, the

22   undersigned should find him disabled here at step five.  This, however, is not an accurate description of the

23   vocational expert's testimony.  Rather, the vocational expert first testified that an individual who had a

24   "marked degree of limitation" in those two areas would be unable to sustain employment. Tr. 642.  The

25   only medical opinion source in the record that appears to have opined as to this degree of limitation though

26   is Dr. Neims. <u>See</u> Tr. 155, 160, 165, 174, 185, 198-99, 233-34, 278, 493, 498, 576, 630.

27

28
_____

[4]Again, plaintiff has not challenged the ALJ's hypothetical question or step five findings based on any omissions or other errors concerning physical functional limitations.

REPORT AND RECOMMENDATION
Page - 19

The vocational expert did also testify that if an individual had a moderate degree of limitation in his or her ability to complete a normal workday and workweek and perform at a consistent pace, as well as in his or her ability to accept instructions and respond appropriately to criticism from supervisors, the ability to maintain employment would be precluded as well. Tr. 642-43.  Dr. Regets did find plaintiff was limited to a moderate degree in each of these areas. Tr. 233.  The undersigned further finds the substantial medical evidence in the record overall indicates plaintiff is at least moderately impaired in these areas.

The majority of the relevant medical opinion source evidence in the record indicates that plaintiff is moderately to markedly impaired in his ability to complete a normal workday and workweek and perform at a consistent pace. See Tr. 160, 233, 498.  The same is true with respect to plaintiff's ability to accept instructions from and respond appropriately, or otherwise relate, to supervisors. See Tr. 160, 165, 174, 233, 278, 493, 498, 576, 630.  Accordingly, because the substantial medical evidence in the record supports a finding that plaintiff is at least moderately impaired in each of the above areas, and because the vocational expert provided uncontroverted testimony that an individual who is so limited would be unable to maintain employment, plaintiff should be found disabled on this basis.

IV.    This Matter Should Be Remanded for an Award of Benefits

The Court may remand this case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." Id.

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Because, as discussed above, the ALJ erred in rejecting the medical evidence in the record concerning plaintiff's

mental functional limitations, because no outstanding issues must be resolved before a determination of disability can be made, and because, also as discussed above, it is clear the ALJ would be required to find plaintiff disabled based on that evidence and the testimony of the vocational expert at step five, this matter should be remanded to the Commissioner for an award of benefits.

<u>CONCLUSION</u>

Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for an award of benefits.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. <u>See also</u> Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **November 23, 2007**, as noted in the caption.

DATED this 29th day of October, 2007.

Karen L. Strombom
United States Magistrate Judge